UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

JULIA R. KELLY,

     Plaintiff,

     v.                            Case No. 1:24-CV-62 JD

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

## OPINION AND ORDER

Plaintiff Julia Kelly appeals the denial of her claims for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act. For the reasons below, the Court will affirm the Commissioner's decision.

### A. Background

Ms. Kelly applied to the Social Security Administration for disability insurance benefits as well as supplemental security income, alleging that she became disabled on April 1, 2020. She was then 40 years old. Her claims were denied, leading to a review by an Administrative Law Judge ("ALJ"), who also denied her claims. (R. at 36.)

The ALJ employed the five-step process to determine whether Ms. Kelly is disabled. At Step 1, the ALJ found that Ms. Kelly "did not engage in substantial gainful activity since April 1, 2020, the alleged onset date." (R. at 25.)

At Step 2, the ALJ determined that Ms. Kelly suffered from one severe impairment: "degenerative disc disease of the cervical spine with chronic cervical radiculopathy status post fusion." (*Id*.) Also under this Step, and as relevant here, the ALJ found that Ms. Kelly's "status

post right carpal tunnel and left carpal tunnel syndrome" were non severe conditions as "[t]here is no evidence that these conditions cause more than minimal vocationally-relevant limitations" and there is no evidence that "that they have lasted or are expected to last at a 'severe' level for a continuous period of 12 months or result in death." (*Id.*)

According to the ALJ, Ms. Kelly underwent an EMG in November 2021, which revealed severe carpal tunnel syndrome in her right wrist and moderate carpal tunnel syndrome in her left wrist. (*Id.*) She was prescribed splints and, two months later, underwent carpal tunnel release surgery on her right wrist. Before the ALJ, Ms. Kelly maintained that she continued to experience severe carpal tunnel syndrome, even after the surgery, but the ALJ disagreed. According to the ALJ, Ms. Kelly "engaged in activities inconsistent with her claims of ongoing hand pain, locking, cramping, and paresthesias." (R. at 25–26.)

> These activities documented in the record include performing household chores (loading and unloading the dishwasher, vacuuming), cooking, driving and running errands, doing wiring for home cameras, travel, attending a "bridal event", and references to possible childcare in the file (throwing away diapers; a mention to the consulting physician of having baby gates at home due to four grandchildren). Also, it is notable that a course of physical therapy in the summer of 2022 was interrupted, before eventual discharge on June 29, by her report of having begun working. (11F/31) When asked about this work activity at hearing, the claimant denied having begun a job but testified that she was helping her sister and her sister's family to set up their new business office. She said this was "a rush deal" and they needed all the help they could get. She said her participation consisted of typing up their new web pages and typing up their new business cards, getting their Facebook page started and ordering products and cleaning supplies for their business. Moreover, the medical record and the claimant's testimony indicates she is able to provide childcare for grandchildren such as changing diapers. This activity is certainly evidence indicating there were minimal, if any, residual effects of carpal tunnel syndrome after the surgery.

(R. at 26.)

At Step 3, the ALJ concluded that Ms. Kelly does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28.)

At Step 4, the ALJ made her RFC determination. She found that Ms. Kelly "has the residual functional capacity[1] to perform light work as defined in 20 CFR 404.1567(b)[2] and 416.967(b) except she cannot climb ladders, ropes, or scaffolds. She can perform occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling." (*Id*.)

In reaching her RFC determination, the ALJ considered Ms. Kelly's claims of pain and exertion limitations. For example, the ALJ observed that, at the hearing, Ms. Kelly testified that she has a history of cervical spine problems which required two surgeries. (R. at 29.) She told the ALJ that, in between the two surgeries, "her neck pain initially got 20–25% better, but then gradually started to get worse and moved further into her arms, shoulders, hips, and thighs. Since the second neck surgery she said her symptoms are about 25–30% better. She still has pain but it is not as extreme as it used to be. However, she now takes medication 3 times a day to help with nerve pain and spasms. She also takes over the counter pain medication. This helps somewhat." (*Id*.) Ms. Kelly further testified

> that her neck pain is constant and her average pain is a 7.5 or 8/10. She said the pain goes down her arms into the middle of her back. She said the pain on her left side usually has her first rib pushed up on top of her shoulder, so her shoulder is

---

[1] "The [residual functional capacity] reflects 'the most [a person] can still do despite [the] limitations' caused by medically determinable impairments and is assessed 'based on all the relevant evidence in [the] case record.'" *Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021) (quoting 20 C.F.R. §§ 404.1545, 416.945(a)).

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567

> always swelled up. She also alleged issues with her hands and problems with her
> daily activities such as dressing and doing her hair. She testified that she changes
> positions a lot to help relieve her symptoms. She stated she has to spend a lot of
> time in her bedroom.

(*Id*.)

After considering Ms. Kelly's subjective complaints, the ALJ concluded that she has

medically determinable impairments that could reasonably cause "some of the alleged

symptoms," but that her allegations "concerning the intensity, persistence and limiting effects of

these symptoms are not entirely consistent with the medical evidence and other evidence in the

record . . . ." (*Id*.)

In support of her conclusion, and as relevant to Ms. Kelly's appeal, the ALJ recounted a

series of physical examinations, tests, and treatments that Ms. Kelly underwent related to her

cervical spine. She first complained to a doctor about neck pain in July 2020. In December 2020,

she had an MRI of cervical spine, which showed a worsening diffuse degenerative disc disease

compared to an MRI five years earlier. (R. at 29.) After trying physical therapy, NSAIDS, and

heat/ice treatments, Ms. Kelly underwent a surgery in January 2021 to fuse C5-C6 discs. Six

weeks later, she rated her pain as a 6 on a 10-point scale. She also reported that her numbness

returned two weeks earlier. The doctor told Ms. Kelly that it was common for symptoms to recur

while nerves were healing. (R. at 30.) At another appointment around the same time, Ms. Kelly

reported that she hurt but she felt that she was gradually getting better.

In April 2021, Ms. Kelly saw her orthopedics doctor, stating that her symptoms had

worsened, and her pain was 10 out of 10. The ALJ found this allegation to be exaggerated:

> [d]espite reporting maximum pain possible at that appointment, on exam the
> surgeon noted the claimant was in no acute distress. Her muscle strength in her right
> and left extremities was 5/5. The claimant was nontender to palpation of the lumbar
> paraspinal muscles. She had full range of motion of the hips for internal/external
> rotation, flexion, and extension bilaterally. There was no tenderness in the bilateral

greater trochanter. Her straight bilateral leg raise was negative for radicular pain. Her bilateral reflexes were normal in the L4 and S1. Her muscle strength in her bilateral lower extremities was 5/5. X-rays of the cervical spine at that time showed that her hardware was in good position and there was no evidence of subsidence. The provider noted that the claimant had had significant relief for many weeks but since had a return of bilateral upper extremity radiculopathy. She was given a referral to pain management.

(R. at 30 (citations to exhibits omitted).)

As recounted by the ALJ, over the next twelve months, Ms. Kelly saw her medical providers regularly, complaining of significant pain. However, the examiners generally found normal sensations and muscle strength, even if the range of motion of her extremities was somewhat reduced. She was referred to, and participated in, physical therapy several times, although with some gaps. Even so, in May 2022, Ms. Kelly underwent a second fusion surgery after complaining of severe pain. (R. at 31–32.)

While recognizing that daily activities "are just one factor to be considered . . . in evaluating subjective complaints and symptoms and assessing the [RFC]," the ALJ again stated that Ms. Kelly's earlier-recounted activities contradicted her subjective complaints. (R. at 33.) The ALJ also observed that her part-time work as a janitor after the alleged onset date and receipt of workers compensation benefits in 2021 conflicted with her claims of debilitating pain and other symptoms. (*Id*.) In addition, the ALJ noted that there were several references in the physical therapy records of Ms. Kelly missing appointments during the Summer of 2022 because of having to work. (*Id*.)

Two state medical consultants opined that Ms. Kelly could perform medium work, but the ALJ discounted those opinions in light of the second cervical surgery, finding that Ms. Kelly was suited for light work only. The ALJ found no evidence that Ms. Kelly had any manipulative limitations.

At Step 4, the ALJ determined that Ms. Kelly is unable to perform any past relevant work. (R. at 35.)

Finally, at Step 5, the ALJ found that, considering Ms. Kelly's age, education, work experience, and the RFC, there are jobs in significant numbers in the national economy that she can perform (a marker, an information clerk, a cafeteria attendant, an order clerk, an ink printer, and a lens inserter). The ALJ arrived at this conclusion after questioning a Vocational Expert at the hearing.

After the Appeals Council denied Ms. Kelly's request for review of the ALJ's decision, she appealed to this Court.

**B.        Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2024) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**C.  Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1.  Whether the claimant is currently engaged in substantial gainful activity;

2.  Whether the claimant has a medically severe impairment;

3.  Whether the claimant's impairment meets or equals one listed in the regulations;

4.  Whether the claimant can still perform past relevant work; and

5.  Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

## D.  Discussion

### (1) *Carpal Tunnel Syndrome*

In her appeal, Ms. Kelly asserts that the ALJ improperly assessed the evidence regarding her carpal tunnel syndrome and failed to build a "logical bridge" between the evidence and the

RFC conclusion, warranting remand. She argues that the ALJ mischaracterized evidence and ignored significant medical records, testimony, and assessments showing ongoing limitations caused by her carpal tunnel syndrome. In addition, according to Ms. Kelly, the ALJ relied heavily on her daily activities, such as cooking, childcare, and attending events, to conclude minimal limitations, even though she required assistance or experienced pain and limitations while performing such tasks.

Ms. Kelly also contends that the ALJ cherry-picked evidence, selectively highlighting activities that suggested minimal impairment while ignoring or downplaying records indicating severe limitations, such as difficulty vacuuming, cooking, or using hand therapy tools. Along the same vein, Ms. Kelly argues that the ALJ "played doctor" by substituting her judgment for medical opinion when concluding that her activities were inconsistent with severe symptoms and rejecting a consulting physician's finding of manipulative limitations.

At step two of the sequential analysis under the Social Security regulations, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii). But "[i]f the evidence indicates that an impairment is a slight abnormality that has no more than a minimal effect on an individual's ability to work, then it is not considered severe for Step 2 purposes." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *see also* 20 C.F.R. § 416.922 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). Plaintiff bears the burden to show that her impairment is severe. *See Young*, 362 F.3d at 1000.

Here, the ALJ determined that Ms. Kelly suffered from one severe impairment: degenerative disc disease of the cervical spine with chronic cervical radiculopathy status post

fusion. On the other hand, the ALJ found that "status post right carpal tunnel release, and left carpal tunnel syndrome" were non-severe conditions because "there is no evidence that [they] cause more than minimal vocationally-relevant limitations." (R. at 26.); *see* 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); *accord* § 416.909. Substantial evidence supports the ALJ's finding, and Ms. Kelly's insistence that the ALJ should have found her carpal tunnel syndrome to be severe amounts to a demand for the Court to reweigh evidence, which it cannot do.

In reaching her conclusion, the ALJ relied on the following evidence:

Ms. Kelly had an EMG in November 2021, which showed severe carpal tunnel syndrome of the right wrist and mild to moderate carpal tunnel syndrome of the left wrist. (R. at 25, 569.) On December 13, 2021, a doctor ordered splints for both wrists. (R. at 25, 575.)

A month later, on January 14, 2022, Ms. Kelly had "a right carpal tunnel release" surgery. (R. at 25, 584.) Seven days after the surgery, Ms. Kelly reported no change to her symptoms and severe limitation in cooking (R. at 667) but, a week later, she reported that the surgery improved her right wrist condition (R. at 584). Ten weeks after the surgery, her medical care provider stated that "Patient has done great; the scars both look fantastic; full range of motion of the wrist; normal sensation throughout; patient is very pleased; follow-up will be p.r.n."[3] (R. at 845 (semicolons added for readability).)

Ms. Kelly underwent physical therapy but her therapist noted on June 28, 2022, that she "[h]as not been able to attend treatment due to new job." (R. at 644; 26.) She was discharged

---

[3]"PRN: [L. *pro re nata*]; according to circumstances; as necessary. Frequently used in prescription and order writing." *Taber's Medical Dictionary Online*, https://perma.cc/D9KY-FX9C (last visited Dec. 3, 2024).

from physical therapy a day later. (R. at 646.) The ALJ asked Ms. Kelly about "this work

activity" at the hearing. (R. at 26.)

> [Ms. Kelly] denied having begun a job but testified that she was helping her sister
> and her sister's family to set up their new business office. She said this was 'a rush
> deal' and they needed all the help they could get. She said her participation
> consisted of typing up their new web pages and typing up their new business cards,
> getting their Facebook page started and ordering products and cleaning supplies for
> their business.

(*Id*.)  The ALJ found that Ms. Kelly's work was "inconsistent with her allegations of ongoing

hand pain, locking, cramping, and paresthesias." As well, the ALJ found that some of Ms.

Kelly's day-to-day activities undermined her claim that she suffered from severe carpal tunnel

syndrome even after her surgery: "household chores (loading and unloading the dishwasher,

vacuuming), cooking, driving and running errands, doing wiring for home cameras, travel,

attending a "bridal event," and references to possible childcare in the file (throwing away

diapers; a mention to the consulting physician of having baby gates at home due to four

grandchildren)." (*Id*.) In her decision, the ALJ stated that she "recognizes that [Ms. Kelley's]

described activities are just one factor to be considered . . . in evaluating subjective complaints

and symptoms and assessing the [RFC]. However, her activities referenced in the record indicate

[Ms. Kelly] has the capacity for much more than her allegations suggest . . . ." (R. at 33.)

In her briefs, Ms. Kelly tries to minimize the fact that she worked for some time during

the Summer of 2022 and mainly attacks the ALJ's determination that she possibly performed

childcare at her home and can wash dishes, vacuum, cook, and drive. (Pl. Br., DE 14 at 13–14.)

She points to her hearing testimony that her grandchildren come to visit often but only with their

parents in tow and they're never left alone with her because she can't watch them. She claims

she only occasionally changed diapers and was only alone with the grandchildren for short

periods of time, as when the parent was taking a shower. (*Id.* at 13.) Ms. Kelly also testified that

her daughters help her get dressed, her son takes out trash, and she rarely goes out shopping, and she can't use a vacuum. (*Id.* at 14.) Finally, Ms. Kelly points out that her attendance of a "bridal event" does not undermine her claim that she suffers from severe carpal tunnel syndrome.

The Court agrees with Ms. Kelly's latter contention: it's hard to see why attending a bridal event would undermine her claim that she suffers from carpal tunnel syndrome in both of her wrists. And if that were the only factor on which the ALJ relied, her case would need a remand for additional consideration. But the ALJ relied on much more than that. The unrefuted evidence demonstrates that Ms. Kelly interrupted her physical therapy treatments to work for her sister at the time when the records show post-surgery improvement to her wrist. More importantly, the medical records subsequent to Ms. Kelly's wrist surgeries support the ALJ's finding.

The ALJ recognized that, as of November 2021, the EMG showed severe right carpal tunnel syndrome and mild to moderate left carpal tunnel syndrome. (R. at 25.) The right wrist carpal tunnel release surgery followed in January 2022 and the left carpal tunnel release surgery took place a month later, in February 2022. While Ms. Kelly had difficulty gripping with her left-hand and noted cooking limitations at a medical visit a week after the left wrist surgery, the notes from a six-week post-surgery visit state that the patient "is not currently in pain." At the same appointment, the medical provider indicated that Ms. Kelly was "very pleased" and "doing great" with regard to her right wrist, and that the incision was healing "fantastic" with Ms. Kelly having full range of motion and intact sensation. (R. at 845.) In fact, the medical provider's notes from all subsequent appointments mention carpal tunnel syndrome only in the context of medical history, namely the two surgeries, and do not indicate any ongoing problems. (*See* medical visit notes from June 23, May 27, and April 20, 2022.) During each of the visits, the muscle and grip

strength is noted to be 5 out 5. And although there's a reference in the physical therapy notes from an August 2022 appointment indicating numbness and tingling in the right hand, this appointment is around the same time when Ms. Kelly interrupted her physical therapy for a job, and she did not continue with physical therapy after that.

Both before the ALJ and in her briefs filed with the Court, Ms. Kelly focuses on the pre-surgery evidence (*see* Pl.'s Br, DE 14 at 9), but that evidence does not add up to a twelve-month period of undergoing a severe medical condition for carpal tunnel syndrome. There's substantial evidence that the surgeries alleviated the severity of the condition at least through most of 2022, thus negating Ms. Kelly's argument that the ALJ erred in finding that her wrist conditions weren't severe. While Ms. Kelly accuses the ALJ of cherry-picking the evidence that was unfavorable to her, apart from her own testimony about her limitations arising from the use of her hands, she has not pointed out any medical evidence that the ALJ has not considered and which suggests that she had significant hand limitations more than six weeks after the surgery. Merely citing her own testimony about post-operative difficulties does not create a "presumption of truthfulness for a [plaintiff's] subjective complaints." *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009). And as the ALJ herself recognized, she could consider Ms. Kelly's daily activities as just one factor in evaluating her subjective complaints. While Ms. Kelly may think that the ALJ should have been persuaded by her testimony, she has not shown that the ALJ ignored her evidence. In light of the medical record, the Court finds that the ALJ's credibility assessment of Ms. Kelly's hearing testimony is not patently wrong. While the ALJ could have made the matter simpler by commenting directly on the evidence following the surgeries, the Court applies the common sense reading of the entire decision. *See Mandeep G. v. Kijakazi*, No. 20-cv-3645, 2023 U.S. Dist. LEXIS 187042, *27 (N.D. Ill. 2023) ("Finally, while the ALJ did

not elaborate on her conclusion that the objective evidence did not support plaintiff's 'assertion that she has not been able to work at any time since the alleged disability onset date,' the Court understands the ALJ to have meant that none of the medical evidence she reviewed supported plaintiff's contention that her MS caused meaningful work-related limitation.") (citing *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) ("The court applies a common-sense reading to the entirety of an ALJ's decision.")); *see also Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) ("[A]lthough an ALJ may not ignore a claimant's subjective reports of pain simply because they are not fully supported by objective medical evidence, discrepancies between objective evidence and self-reports may suggest symptom exaggeration.") And whether this Court would have arrived to the same conclusion is irrelevant because it may not reweigh evidence in reviewing the Commissioner's decision. *See Lopez ex rel. Lopez*, 336 F.3d at 539 (in evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). While the ALJ's reasoning is not flawless, she sufficiently analyzed the evidence to permit a meaningful review. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("[T]he ALJ must . . . explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *see also Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are . . . ."). Having reviewed the ALJ's decision regarding the severity of Ms. Kelly's carpal tunnel condition, the Court finds that it is based on substantial evidence.

Next, Ms. Kelly argues that the ALJ impermissibly "played doctor," but the Court is not convinced. The ALJ did not substitute her opinion for that of a medical expert or interpret the meaning of certain tests or diagnoses. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (an ALJ plays doctor where he "substitute[s] his own judgment for a physician's opinion without relying on other medical evidence or authority in the record"). Contrary to Ms. Kelly's claim, the ALJ did not make any independent medical findings when she observed that "[Ms. Kelly has engaged in activities that are inconsistent with her allegations of ongoing hand pain, locking, cramping, and paresthesias." (R. at 26.) There is nothing improper about this determination, particularly given the medical post-surgery assessments that Ms. Kelly had a significant recovery and even worked for part of the summer in 2022. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that [the plaintiff] was not at his best, the fact that he could perform some [part-time] work cuts against his claim that he was totally disabled."). Ms. Kelly argues that the ALJ's error is further made evident by her rejection of one of the state agency consultant's opinions that she requires manipulative limitations. (R. at 34.) But Ms. Kelly ignores that there were two state agency consultants and only the second one, Katrina Hopson, found that her right hand's fine manipulation was limited. (R. at 101, 110.) The first consultant, Mirissa Wilson, who issued her opinion a week after the EMG study, found no manipulative limitations. (R. at 85, 93.) In other words, although Ms. Kelly would like the Court to treat Katrina Hopson's finding regarding manipulative limitations as definitive, the evidence is not so one-sided. Ms. Kelly also ignores that the ALJ explained why she rejected the second consultant's opinion: the opinion was issued two months after the wrist surgery, before the extent of her recovery was made evident, and the opinion was contradicted by the actual activities that Ms. Kelly was engaged in. In summary, the ALJ made

no independent medical finding in analyzing evidence related to Ms. Kelly's wrist and hand condition to warrant a remand. *Cf. Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (it is not the role of the ALJ to make her own independent medical findings).

### (2) *Cervical Spine*

Ms. Kelly argues that the ALJ cherry-picked evidence and disregarded MRI findings, effectively ignoring entire lines of contrary evidence. However, based on her briefs, she appears to identify only two specific pieces of such evidence. She states that the ALJ recognized that the MRI report from June 2021 described Ms. Kelly as suffering from degenerative disc disease "with mild to moderate foraminal narrowing" (Pl. Br., DE 14 at 16 (citing R. at 31)) but failed to recognize that "imaging from April of 2022 showed 'moderate to severe' degenerative disc disease with 'severe left foraminal stenosis.'" (*Id.*) Likewise, she says that "the ALJ never considered that the initial MRIs from 2020 showed "severe stenosis with Myelomalacia." Other than these two pieces of medical information, Ms. Kelly essentially restates the ALJ's findings. (*Cf.* Pl.'s Br., DE 16 at 14–15 *with* R. at 29–31.) Although the ALJ did not explicitly mention these diagnoses, she acknowledged in her findings that Ms. Kelly underwent two cervical spine surgeries, each occurring after the respective medical findings. Since the ALJ does not suggest that the surgeries were medically unnecessary, the omission of these diagnoses is harmless. After all, it's clear from a review of the medical notes that the surgeries were intended to alleviate the issues identified in the MRI reports and observed by the surgeon in his summaries. So even if the ALJ omitted to mention certain aspects of the reports, there's no suggestion that she in any way minimized their substance given the subsequent surgeries.

16

Ms. Kelly also criticizes the ALJ for overlooking physical therapy records that describe severe limitations in her ability to sit and stand. However, the ALJ specifically referenced a June 2022 discharge note from physical therapy, where Ms. Kelly reported feeling most comfortable during prolonged walking or continuous movement—evidence the ALJ interpreted as supporting a capacity for light rather than sedentary work. Therefore, Ms. Kelly's claims about the ALJ ignoring evidence and cherry-picking appear to be more about nitpicking the ALJ's decision than identifying substantial omissions. The Court will not engage in this approach, as the ALJ need not be perfect; instead, she only needs to base her decision on substantial evidence. *See Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010) ("Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading."); *Warnell v. O'Malley*, 97 F.4th 1050, 1053–1054 (7th Cir. 2024) ("Time and time again, we have emphasized that social-security adjudicators are subject to only the most minimal of articulation requirements. An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning. All we require is that ALJs provide an explanation for how the evidence leads to their conclusions that is sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the appellant] meaningful judicial review. At times, we have put this in the shorthand terms of saying an ALJ needs to provide a logical bridge from the evidence to his conclusion.") (quotation marks and citations omitted).

The ALJ's finding that Ms. Kelly's alleged symptoms conflict with the evidence in the record is supported by substantial evidence. First, the ALJ noted that Ms. Kelly worked during the period of her alleged disability: as a janitor during the third quarter of 2020 into the first quarter of 2021; for her sister during the Summer of 2022; and in August 2022, she told a

physical therapist that "she did not work yesterday" because of pain from physical therapy. (R. at 25 (citing R. at 55); R. at 33 (citing R. at 625).)

The ALJ also reviewed Ms. Kelly's many medical appointments, highlighting that her examinations indicated her leg and hand strength was either intact or mostly intact, and that she had full motor function and intact sensation. (R. at 30 (citing R. at 426–29; R. at 31 (citing R. at 465–67).) The ALJ acknowledged that Ms. Kelly underwent two surgeries to fuse discs in her cervical spine and that, while her symptoms improved, she has not been pain-free. Nevertheless, at her October 2021 consultative examination, Ms. Kelly exhibited a normal gait, full motor strength, normal fine finger skills and grip strength. (R. at 31–32 (citing R. 523–34).) She mounted and dismounted the examination table with ease, walked on heels and toes, and performed a complete squat. *Id*. Despite radiculopathy, a month later, she exhibited full motor function and grip strength, as well as normal reflexes and sensation. (R. at 32 (citing R. at 574–75).) Six weeks after the procedure to fuse two other vertebrae in May 2022, her radiculopathy had improved. (R. at 32 (citing R. at 832).) And although she attended only seven of twelve recommended physical-therapy sessions thereafter, her pain had improved to a reported 5 out of 10. (R. at 32.) This evidence is adequate to support the ALJ's decision. *Cf. Biestek v. Berryhill*, 139 S. Ct. at 1154 ("And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (quotation marks and citations omitted).

Ms. Kelly is adamant that the ALJ "played doctor" by substituting her opinion for that of a medical provider when she discounted Ms. Kelly's complaints of severe pain (10 out of 10) based on the surgeon's finding that she was in "no acute distress." (Pl.'s Br., DE 14 at 17; *see* R.

at 30.) She contends that the doctor did not question her reports, and the ALJ should not have either. She asserts that the surgeon believed her, as shown by his referrals for physical therapy, pain management, and steroid injections. (Pl.'s Br., DE 14 at 17.)

Notably, the records do not explain what the surgeon meant by "no acute distress," so the ALJ could rightfully assume that the notations meant that Ms. Kelly did not experience limitations to the degree that she alleged. *See, e.g.*, *Wanserski v. Colvin*, No. 1:14-CV-1033-DKL-JMS, 2015 WL 5692521, at *7 (S.D. Ind. Sept. 28, 2015) ("acute" can refer to a disease, health effect, or symptom having a sudden, abrupt onset and a short, but severe, course, rather than a chronic condition or symptom having a slow development and a protracted but mild course; and, for physicians' purposes, "no acute distress" can simply mean that a patient will probably not become unstable in the next five minutes). Most importantly, however, in concluding that Ms. Kelly's pain was more controlled than she represented, the ALJ relied on more than the surgeon's assessment that she was in "no acute distress." In fact, the ALJ considered multiple other aspects of the examination:

> At her appointment at orthopedics in April 2021, she reported her symptoms had worsened and now rated her achy pain as a 10/10 (Ex. 1F/78). Despite reporting maximum pain possible at that appointment, on exam the surgeon noted the claimant was in no acute distress. Her muscle strength in her right and left extremities was 5/5. The claimant was nontender to palpation of the lumbar paraspinal muscles. She had full range of motion of the hips for internal/external rotation, flexion, and extension bilaterally. There was no tenderness in the bilateral greater trochanter. Her straight bilateral leg raise was negative for radicular pain. Her bilateral reflexes were normal in the L4 and S1. Her muscle strength in her bilateral lower extremities was 5/5 (Ex. 1F/79). X-rays of the cervical spine at that time showed that her hardware was in good position and there was no evidence of subsidence. The provider noted that the claimant had had significant relief for many weeks but since had a return of bilateral upper extremity radiculopathy. She was given a referral to pain management (Ex. 1F/80). It was also recommended that the claimant do physical therapy for her lower back (Ex. 1F/81).

(R. at 30.)

The ALJ similarly assessed Ms. Kelly's medical appointment in November 2021:

> Also in November 2021, she underwent an EMG which was consistent with chronic right C7 radiculopathy (Ex. 8F/12). She then went to her doctor to review the test findings. At that time her exam showed she was in no acute distress. Exam of her cervical spine showed her bilateral sensation was normal and she had normal reflexes. Her muscle strength, including grip strength, was 5/5 (Ex. 8F/17). Exam of her lumbar spine showed light touch sensation was normal in all dermatomes. Her straight bilateral leg raise was negative for radicular pain. Her strength in the lower extremities was 5/5 (Ex. 8F/17). At that time it was recommended the claimant continue with conservative care for her cervical spine (Ex. 8F/18).

(R. at 32.) Considering the ALJ's reliance on criteria other than just the absence of "acute distress," even if Ms. Kelly is right that this term can mean only one thing—that "the patient will probably not become unstable in the next five minutes (Pl.'s Br., DE 14 at 17)[4]—it cannot be said that the ALJ substituted her own opinion for the opinion of the surgeon. *See John J. v. Kijakazi*, No. 20 CV 50118, 2021 WL 3910750, at *5 (N.D. Ill. Sept. 1, 2021) (finding no error where the ALJ "relied not only on the repeated finding that Plaintiff was in 'no acute distress,' [but also] on the fact that Plaintiff was talkative or making jokes while requesting additional treatment for his pain"). This finding is not a medical conclusion, as plaintiff asserts; it is a determination within the ALJ's purview to evaluate a claimant's subjective allegations in light of other evidence, including objective medical evidence. *See* 20 C.F.R. § 404.1529(a) ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. . . . However, statements about your pain or other

---

[4] For the meaning of the term "acute distress," Ms. Kelly cites to what looks like a presentation slide on the web created in 2015 and meant for physicians engaged in billing the insurance companies for treatment of their clients. *Physician Documentation—No Acute Distress*, https://perma.cc/ZT8T-ML4H (last visited Dec. 4, 2024). In turn, the Commissioner provides a competing definition: "'No Acute Distress' . . . indicates that a patient is not exhibiting signs or symptoms of acute distress or discomfort at the time of evaluation." (Def.'s Br., DE 19 at 6 (citing to *Demystifying NAD: Understanding the Medical Abbreviation*, https://perma.cc/R6GH-6UP9 (last visited Dec. 4, 2024).)

symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. . . .").

In closing, the Court notes that Ms. Kelly contends that the ALJ improperly assessed her daily activities; however, this argument overlaps with her claim regarding the evaluation of her carpal tunnel syndrome, discussed above. Therefore, the Court need not address it separately. Nevertheless, it's worth noting that the ALJ's finding that the extent of the daily activities undermines Ms. Kelly's claims of the severity of her pain (8, 9, or 10 out of 10) is that much more valid in this context: it was reasonable for the ALJ to conclude that Ms. Kelly was exaggerating her claims of *debilitating* pain, given that she was still able to do household chores, wire home cameras, and travel, as well as help her sister set up a new business. *See Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021) ("[T]he ALJ correctly looked at Plaintiff's daily activities to see if they corroborated her pain claims, and she found that they did not. She did not equate Plaintiff's activities to full-time work.")

### F. Conclusion

For these reasons, the Court AFFIRMS the Commissioner's decision. The Clerk is DIRECTED to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: December 10, 2024

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court